UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                        :

**RAJSEAN ANDERSON**,               :

                    Plaintiff,      :

                                  :    **MEMORANDUM DECISION AND ORDER**

        – against –          :

                                  :    21-CV-4135 (AMD) (PK)

**CITY OF NEW YORK, MATTHEW COMMENDER, JOHN AND JANE DOE 1 THROUGH 10**,          :

                                  :

                  Defendants.    :

-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff brings Section 1983 and state law claims arising out of his arrest for an April 9, 2020 shooting in Staten Island.  The prosecution dismissed the case against the plaintiff because an eyewitness stopped cooperating.

Before the Court are the defendants' motion for summary judgment and the plaintiff's cross-motion to amend the complaint to add two detectives as defendants.  For the reasons explained below, I grant the defendants' motion for summary judgment and deny the plaintiff's cross-motion to amend.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements[1] and portions of the record, and are undisputed unless otherwise noted.

---

[1] Citations to the defendants' Rule 56.1 statement are to ECF No. 60, and citations to the plaintiff's Rule 56.1 counterstatement are to ECF No. 70.

I.    **Factual Background**

a.    **Initial Investigation of April 9, 2020 Shooting**

On April 9, 2020 at approximately 6:59 p.m., a ShotSpotter[2] picked up the sound of shots fired in the "vicinity of 60 North Burgher Avenue," and notified law enforcement through the 911 system. (*See* Def. 56.1 ¶¶ 6, 13.)  Two witnesses — Octavio Mercado of 59 North Burgher Avenue and Linda Gordon of 39 Markham Lane[3] — called 911. (*Id.* ¶¶ 10–11.)  Both told the 911 operator that they had heard "four gunshots;" Gordon also said that after the shots a young Black man ran away. (*Id.*)

Law enforcement officers, including defendant Detective Matthew Commender, arrived at the scene. (*Id.* ¶¶ 15, 19.)  Commender spoke with 61 North Burgher Avenue resident Rosalyn Vigo, who told him that she heard between six and seven gunshots and saw people running in and out of the yard at 65 North Burgher Avenue. (*Id.* ¶¶ 21–22.)  Mercado, one of the two 911 callers, told Commender that he heard approximately five gunshots coming from outside, and then heard cars racing down North Burgher Avenue. (*Id.* ¶¶ 26–27.)  Officer Intranuovo,[4] from the Evidence Collection Unit, found one nine-millimeter shell casing on the front porch of 61 North Burgher and another nine-millimeter casing underneath the porch. (*Id.* ¶ 28.)

The next day, Detective Siciliano[5] told Commender about Kevin Asare's Instagram video in which Asare said that he was "shot at" the previous night. (*Id.* ¶¶ 31–32.)  Asare also posted

---

[2] "A ShotSpotter is a device that detects a shooting, and automatically provides law enforcement with the location of that shooting through 911; the device looks like a microphone and its exact location is unknown." (Def. 56.1 ¶ 14.)

[3] Markham Lane and North Burger Avenue intersect near 59 North Burgher Avenue.

[4] Intranuovo is not a defendant in this action.

[5] Siciliano is not a defendant in this action.

footage of the car.  (*See id.* ¶ 32; ECF No. 59-13.)  On April 18, 2020, Detective Denora[6] matched the car in Asare's Instagram video to the car that video surveillance footage captured as it drove past 59 North Burgher Avenue at the time of the shooting.  (Def. 56.1 ¶ 36.)

> **b.    Meeting with Kevin Asare**

On April 21, 2020, at about 2:00 p.m., Commender and Denora met Asare and his girlfriend, M.M.  (*Id.* ¶¶ 42–44.)  As discussed further below, the plaintiff disputes that M.M. was there.  (*Id.* ¶ 43 (response).)

Asare told Commender that someone shot at his car on April 9, 2020 when he was driving on North Burgher Avenue to pick up his girlfriend.  (*Id.* ¶¶ 44–49.)  Bullets hit the front windshield and driver's side window.  (*Id.*)  He could not identify the shooter.  (*Id.*)  He confirmed that he posted the Instagram video described above.  (*Id.*)

> **c.    Meeting with M.M.**

The detectives say that they spoke with M.M. alone.  (*Id.* ¶ 50.)  The plaintiff claims that M.M. never spoke with law enforcement during the investigation.  (*See* Pl. 56.1 ¶ 50 (response).)[7]  The defendants assert that M.M. was fearful and did not want Asare to know that she was meeting with the police, and that she told Commender that she wanted to talk to him somewhere else.  (*Id.* ¶¶ 50, 55–56.)

In the afternoon of April 21, 2020, Commender and M.M. exchanged a series of text messages about the investigation:[8]

---

[6] Denora is not a defendant in this action.

[7] As discussed in further depth below, the plaintiff disputes this assertion based on M.M.'s unsworn statement to his private investigator that she "does not talk to cops and did not meet with the cops."  (*See* Pl. 56.1 ¶ 43 (response).)

[8] While the plaintiff maintains that M.M. never spoke to the police, he nevertheless cites the text messages to make arguments in the alternative.  (*See id.* ¶ 59 (response) ("accepting, *arguendo,* that M.M. did communicate with Commender at some point").)

Commender: Hey it's detective commender call or text me when you can

M.M.: Hello

M.M.: Yes my friend said it was this kid rahshawn he lives over there on skinner lane

M.M.: They call him ray ray he's a younger kid

. . .

Commender: I know exactly who it is, that's who we thought did it

. . .

M.M.: I know him from my friend he hangs with her brother

Commender: Ok, Is there anyone that saw him do it that will talk to us

M.M.: I can ask my friend can't make a promise but I heard he did it to become an ape blood they are suppose to shoot at all the crips

Commender: You definitely didn't see the shooter ?

M.M.: It's a big thing going on Staten Island with the gangs and it's the young boys that's causing

. . .

Commender: Alright.  I think it's been the kid ray ray for a couple so if we could get him on the one where he shot at you guys it would help a lot

M.M.: Ask the lady that lives in the side apartment her name is Anna she will cooperate because she is tired of it as well

M.M.: I don't want to say the wrong thing and im on paperwork you know

Commender: Unless you literally saw who shot you can't be a witness in court

M.M.: I saw him

Commender: If you saw him shooting it would really be great if you would come forward, I know people don't like to

Commender: Your name wouldn't be anywhere only if it goes to trail.  We could redact it out of everything

M.M.: I saw him I was walking out the house to go in the car he was coming across the street to go to the house I left from once I closed the door I locked up he let off a shot as we ducked Kevin go out the car to run I went into shock I got in driver side and drove off to find Kevin because I didn't know if he was hurt or not

M.M.: It was just weird because prior to this I was there at friends home almost every day

Commender: If you would just allow us to arrest him and then just take it step by step you would be saving a of Violence over there and standing up for your fiancé and family.

M.M.: Arrest Kevin

M.M.: Or rayshawn

Commender: No arrest the kid ray ray

M.M.: Ok

Commender: But in order to do that I would need you to sign a photo array first.  And everything after that we could take step by step

M.M.: Okay

Commender: Can you meet up again today somewhere ?  To sign it and talk

M.M.: Yes I can meet you at 6 at ctown over here by grasmere train station

. . .

M.M.: Will this effect Kevin in any way

Commender: No not at all

. . .

M.M.: Will Kevin be arrested by me identifying the shooter is what I'm asking

Commender: No not at all

Commender: He didn't do anything wrong

Commender: I promise you that

M.M.: I just need you to text Kevin will not be arrested

Commender: No one cares that he was driving trust me, not us or parole

(ECF No. 67-15 at 1–12.)

Commender put together a photo array that included the plaintiffs' photo. (*Id.* ¶¶ 62–63, 85.) He asked Detective Richard Dinkle[9] to show the photo array to M.M. (*Id.* ¶¶ 62–63.)[10]

Later that day, Commender met Detectives Dinkle and Michael Burke[11] in the parking lot of 2071 Clove Road. (*Id.* ¶¶ 64–65.) According to the detectives, M.M. got in Commender's car and told him that on April 9, 2020, she was waiting in 65 North Burgher Avenue for Asare. (*Id.* ¶¶ 68–70.) After she got into Asare's car, "Ray Ray" fired a gun at Asare's car, striking the front windshield. (*Id.*) She "ducked down," and Asare got out of the car and ran. (*Id.* ¶ 71.) She jumped into the driver's seat and drove away. (*Id.* ¶ 72.)

After she spoke with Commender, M.M. got into Dinkle's car. (*Id.* ¶ 80.) Burke left the car and Dinkle showed M.M. the photographic array. (*Id.* ¶¶ 81–83.) M.M. identified the plaintiff as the person who shot at Asare's car on April 9, 2020. (*Id.* ¶¶ 84–85.)[12] Dinkle told Commender about the identification, and Commender "activated a probable cause i-card for [the] plaintiff," which alerted other officers that there was probable cause to arrest the plaintiff. (*Id.* ¶ 86.)

### d.    The Plaintiff's Arrest

On April 23, 2020, officers arrested the plaintiff at his home. (*See id.* ¶ 87.) They notified Commender, who interviewed the plaintiff at the precinct. (*Id.* ¶ 89.) The plaintiff was charged with attempted murder in the second degree, criminal possession of a weapon in the second degree, attempted assault in the first degree, criminal possession of a weapon in the third

---

[9] The plaintiff moves to amend to add Dinkle as a defendant in this action. (ECF No. 57.)

[10] The detective used the double-blind method to conduct the photographic array. (*Id.* ¶¶ 73–74.) In this method, an officer who does not know the subject, is not involved in the investigation, and does not know anything about it, shows the array to the witness. (*Id.*)

[11] The plaintiff moves to amend to add Burke as a defendant in this action. (ECF No. 57.)

[12] The photo array was Dinkle and Burke's only involvement in the investigation. (*Id.* ¶ 79.)

degree, and reckless endangerment in the first degree.  (ECF No. 59-9 at 2.)  A criminal court judge set bail at "two hundred thousand dollars bail or bond, or a one million dollar partially secured bond."  (Def. 56.1 ¶ 91; ECF No. 59-9 at 22.)  The plaintiff did not make bail and remained in custody.  (ECF No. 59-9 at 23.)

On the afternoon of April 28, 2020, Commender and M.M. exchanged more text messages:

> Commender: Hey it's detective commender
>
> M.M.: Yes 3 detectives banged on mi [sic] door extremely loud . . .
>
> M.M.: Stating you sent them to speak to us
>
> Commender: It was a mistake , we had a miscommunication
>
> Commender: I wanted them to see a different victim they looked at the wrong case, I apologize
>
> . . .
>
> M.M.: They arw [sic] on my ring camera stating they don't care we spoke with you and that they will keep coming
>
> Commender: I spoke with them.  It was a mistake
>
> M.M.: This is causing mi [sic] kid to have an asthma attack having us including children in distress
>
> M.M.: Tell them mask you next time I will sue it's the law to have a mask worn outside in public
>
> M.M.: Thank you

(ECF No. 67-15 at 15–18.)

Commender had the "impression" that M.M. "was not seeming like she wanted to cooperate," an impression he communicated to the DA's office.  (*Id.* ¶¶ 96–97.)  The plaintiff disputes this, citing Assistant District Attorney ("ADA") Matthew Signorile's deposition testimony:

> A: . . . By May 21st, [2020,] I was assigned the case. . . . I was the lead person at the time.
>
> Q: At this point, there are representations in your affirmation about concerns about the witness's safety.  Would you agree?

7

A: Yes.

Q: Do you know, at this point, whether you had spoken to the witness?

. . .

A: I did not.

. . .

Q: Do you know whether you had any understanding about [M.M.'s] availability as of May 21st of 2020?

A: My understanding was that she was cooperative, however fearful.

Q: And who did you gain that understanding from?

A: I don't remember.

Q: Do you know if it was the detective who was the lead detective in the case, Commender?

A: I don't remember.

. . .

Q: Did you at some point learn that there was any issue with witness availability?

A: Yes.

Q: When did you learn that?

A: Based off my case notes, it was August 2020.

(ECF No. 59-19 at 36–39; *see* Pl. 56.1 ¶ 97 (response).)

>    **e.    Meeting with J.S.**

Another officer told Commender that J.S., recently arrested on unrelated charges, might have information about the shooting.  (Def. 56.1 ¶ 98; ECF No. 59-2; ECF No. 59-12.) Accordingly, Commender met with J.S. on May 15, 2020.  (Def. 56.1 ¶ 98; ECF No. 59-12 at 116:15–18.)

J.S. told Commender that the plaintiff and Lasou Kuyateh were at 65 North Burgher on April 9, 2020.  (Def. 56.1 ¶¶ 99–100.)[13]  Kuyateh had an "ongoing issue" with Asare, and that "their plan" was for "Kuyateh to shoot [Asare] when he picked up [M.M.]."  (*Id.* ¶¶ 100–02 (citing ECF No. 59-2).)  Kuyateh decided not to do it and handed the gun to the plaintiff.  (*Id.* ¶ 102.)  J.S. saw the plaintiff shoot at Asare's car while M.M. was coming out of 65 North Burgher Avenue.  (*Id.* ¶ 101.)  On May 16, 2020, "J.S.'s contact information was relayed to the District Attorney's Office."  (*Id.* ¶ 103.)[14]

### f.    The Criminal Case Is Dismissed

On May 21, 2020, ADA Signorile asked the court for a "good-cause extension" so that he could present the case to a grand jury rather than at a preliminary hearing.  (*Id.* ¶ 109 (citing ECF 59-19 at 35:03–12.)[15]  According to ADA Signorile, M.M. was afraid to testify against the plaintiff at a preliminary hearing because she thought the plaintiff was violent and was connected to a gang — "another crew on Staten Island."  (*Id.* ¶¶ 110–11.)  The plaintiff's defense lawyer opposed the People's request.  (*Id.* ¶ 112.)  Richmond County Criminal Court Judge Tamiko Amaker granted the motion.  (*Id.* ¶ 113; *see* ECF No. 59-20.)

In August 2020, ADA Signorile contacted Commender about witness availability.  (Def. 56.1 ¶ 114.)  Commender texted M.M.,[16] and asked when she could meet with the District Attorney's Office about the case.  (*Id.* ¶ 115.)  M.M. responded that she would text him "next

---

[13] The plaintiff does not dispute that J.S. and Commender spoke, but relying on J.S.'s statements made to his private investigator, claims that J.S. was not at 65 North Burgher the night of the shooting and did not tell Commender that she was.  (*See* Pl. 56.1 ¶ 99 (response).)

[14] The defendants do not say who gave the information to the District Attorney's Office or identify the person to whom they gave it.

[15] At that time, "there were no Grand Jury presentations due to COVID-19."  (Def. 56.1 ¶ 104.)

[16] The plaintiff "dispute[s] that M.M. texted with the police, but to the extent she did, her response further supported her lack of cooperation."  (Pl. 56.1 ¶ 115 (response).)

week." (*Id.* ¶ 117.)  Commender tried to text M.M. on August 13, 2020, but his message did not

go through; he believed that she had either blocked him or changed her number.  (*Id.* ¶¶ 118–

119.)  ADA Signorile and "Detective Investigators from the Richmond County District

Attorney's Office" tried unsuccessfully to contact M.M. on August 14, 2020.  (*Id.* ¶¶ 121–124.)

The plaintiff's criminal case was dismissed[17] because of M.M.'s refusal to cooperate, and the

plaintiff was released from custody on August 20, 2020.  (*Id.* ¶¶ 124–126.)

## II.   Procedural History

### a.   Civil Litigation Commences

The plaintiff commenced this action on July 22, 2021 (ECF No. 1), bringing (1) a 42

U.S.C. § 1983 false arrest/unlawful imprisonment claim (*id.* ¶¶ 34–37); (2) a § 1983 violation of

right to a fair trial claim (*id.* ¶¶ 38–42); (3) a § 1983 malicious prosecution claim (*id.* ¶¶ 43–46);

(4) a § 1983 failure to intervene claim (*id.* ¶¶ 47–51); (5) a state law false arrest claim (*id.* ¶¶ 71–

75); and (6) a state law malicious prosecution claim (*id.* ¶¶ 88–92).[18]

### b.   Recordings of M.M. and J.S.

In May 2022, the plaintiff produced audio recordings of M.M. and J.S. speaking to the

plaintiff's private investigator, Daniel Reefer.  (Def. 56.1 ¶¶ 127–154; ECF No. 68; ECF No. 71

at 7.)

The investigator recorded an April 23, 2022 conversation with M.M.  (ECF No. 68.)

Someone can be heard opening the door, and Reefer asked if she remembered identifying the

plaintiff.  (ECF No. 68-1.)  She replied, "I've never ID'd anyone, I don't even speak to the

---

[17] The parties do not say when the case was dismissed.

[18] The plaintiff dismissed Officer Salvatore Todaro from the lawsuit on April 20, 2023.  (ECF No. 42.)
The plaintiff withdrew supervisory liability, municipal liability, assault, battery, and negligence claims
against all defendants on December 4, 2023.  (ECF No. 55.)

police." (*Id.*)  When Reefer showed her the text messages with Commender, she said that she was not M.M., that M.M. is her sister.  (*Id.*)  Reefer said he was "investigating the detective." (*Id.*)  Reefer came into the house and M.M. told him that she really was M.M.  (*Id.*)  She asked if Reefer wanted to know about "Kevin."  (*Id.*)  Reefer said that he was not asking about Kevin, and wanted to know if she "felt pressured to ID somebody."  (*Id.*)  M.M. said that the detective "followed [her] from [her] house to the Home Depot," "pulled [her] over to his car window" and asked about the shooter.  (*Id.*)  M.M. said she "was not there," "not on the scene" and did not know what happened until the police came to her home "because it was Kevin's car supposedly that had got shot at."  (*Id.*)  She said that the car was not damaged, and that the police seized it but never returned it.  (*Id.*)  When Reefer asked why she identified the plaintiff's photograph, she said that she "didn't speak to" the detective, and that he "didn't show [her] nothing."  (*Id.*)  She said that she did not understand why he was talking to her then because "the person that was shooting" was "already in jail."  (*Id.*)

Reefer recorded a conversation with J.S. on May 22, 2022.  (ECF No. 68.)  J.S. said that she told Commender that she "arrived" at the scene of the shooting "when the situation was already finished," and that she "literally [knew] nothing about it because [she was] not there" and never saw the shooting.  (ECF No. 68-2.)  She never gave the detectives any information, but also said that the detectives paid her sister and a friend to provide information.  (*Id.*)  Commender asked her if she knew "Rajsean Wallace" and she said that she did.  (*Id.*)

### c.    Attempts to Depose M.M. and J.S.

The defendants tried unsuccessfully to schedule depositions of M.M. and J.S.  (Def. 56.1 ¶¶ 127, 145.)  The defendants served three subpoenas and three notices by process server on either M.M. or a suitable adult at her address of record.  (*Id.* ¶¶ 127, 132–135.)  The defendants

"also requested plaintiff's counsel's assistance to produce" M.M. for a deposition; "counsel has been unable" to do so.  (*Id.* ¶ 154.)

The defendants also tried to serve J.S. with a notice of subpoena at the address that the plaintiff's counsel provided.  (*Id.* ¶ 147.)  The defendants "also requested plaintiff's counsel's assistance to produce" J.S. for a deposition; "counsel has been unable" to do so.  (*Id.* ¶ 154.)

### d.    Motions

On February 29, 2024, the defendants moved for summary judgment.  (ECF No. 58.) The plaintiff filed a cross-motion to amend the complaint to add Detectives Dinkle and Burke as defendants (ECF No. 57) and a proposed amended complaint (ECF No. 57-2).  The plaintiff opposes the motion for summary judgment and the defendants oppose amendment.

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment is appropriate if the parties' submissions — including pleadings, deposition transcripts, affidavits, and other documents in the record — show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant has the burden of showing that there are no genuine disputes of material fact.  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party opposing summary judgment must identify specific facts and affirmative evidence showing that there is a genuine issue for trial.  *Ethelberth v. Choice Sec. Co.*, 91 F.

Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex*, 477 U.S. at 324). The "mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252. And, the nonmoving party must do more than point to "some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). He must instead identify the "specific facts" that demonstrate a genuine issue for trial, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and "offer some hard evidence showing that its version of events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). If the nonmoving party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Liberty Lobby*, 477 U.S. at 249–50 (citation omitted).

The Court views "the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (cleaned up).

## II.   Amendment

A plaintiff may amend his pleading "once as a matter of course within . . . 21 days after serving it, or . . . 21 days after service of [a responsive pleading or a motion under Rule 12(b)]." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2); *Gross v. PennyMac Loan Servs., LLC*, No. 20-CV-4192, 2021 WL 2634764, at *1 (E.D.N.Y. June 25, 2021). It is "within the sound discretion of the district court to grant or deny leave to amend." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks

and citation omitted).  "Although Rule 15 admonishes courts to freely give leave when justice so requires, it does not thereby mandate that courts grant leave in the face of reasons to deny it." *Bat, LLC v. TD Bank, N.A.*, No. 15-CV-5839, 2018 WL 4693644, at *4 (E.D.N.Y. Sep. 28, 2018) (internal citation and quotations omitted) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)). Leave may be denied where the proposed amendment would be futile — where the "amended portion of the complaint would fail to state a cause of action."  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019).

## DISCUSSION

### I.    Admissibility of M.M.'s and J.S.'s Recorded Statements

"When deciding a motion for summary judgment, a federal district court may consider only admissible evidence."  *Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (citing *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993)).  A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment absent a showing that admissible evidence will be available at trial."  *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985).  Here, the plaintiff bears the burden of establishing that the recordings he cites in opposing summary judgment are admissible.  Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); Advisory Cmte. Note to 2010 Amendment to Fed. R. Civ. P. 56(c) (following objection under Rule 56(c)(2), "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated"); *see Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 46 (2d Cir. 2015) (citing Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment).

The plaintiff bases his factual disputes on statements that M.M. and J.S. made in the audio recordings with the plaintiff's private investigator.  Relying only on those recordings, the plaintiff maintains that M.M. did not speak to Commender and that neither she nor J.S. identified the plaintiff as the shooter.  (*See* Pl. 56.1 ¶¶ 43, 50–59, 61, 65–73, 79–86, 93–96, 99–102, 110–111, 115–119, 125 (responses).)  However, the plaintiff has not established that the recordings of M.M. and J.S. are admissible or could be introduced at trial in admissible form.  *See Rodriguez*, 788 F.3d at 46.  Of course, the recordings themselves are inadmissible hearsay, and courts routinely decline to consider them on summary judgment.  Fed. R. Evid. 801(c); *see Ferguson v. City of New York*, No. 17-CV-6871, 2023 U.S. Dist. LEXIS 159861, *9–10 (E.D.N.Y. Aug. 29, 2023) (holding that the plaintiff could not oppose summary judgment by relying on "unequivocal[] hearsay" witness statements in a plaintiff's private investigator's report); *Smith v. Lamz*, 321 F.3d 680, 685 (7th Cir. 2003) (unsworn third-party statements quoted in private investigator's report are inadmissible as hearsay); *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 699 n.6 (8th Cir. 2020) ("Kiman attempts to demonstrate that a genuine issue of material fact exists as to whether any law enforcement officer actually spoke to Johnson.  Kiman points to a private investigator's summary of a conversation he had with Johnson some time between 2016 and 2019.  The private investigator's summary states that Johnson told him that, to the best of his recollection, he had not been contacted or interviewed by any law enforcement officer.  However, the private investigator's summary of his conversation with Johnson constitutes inadmissible hearsay, which 'may not be used to defeat summary judgment.'  Accordingly, this evidence does not create a genuine issue for trial. (internal citations omitted)); *Med. Assur. Co. v. Miller*, 779 F. Supp. 2d 902, 915 n.2 (N.D. Ind. 2011) ("Hearsay in private investigators' reports that does not qualify for an exception is properly excluded from consideration" on summary

judgment); *see also United States v. Wilson*, 281 Fed. App'x 96, 99 (3d Cir. 2008) (statements to private investigator did not qualify for residual exception to hearsay prohibition).

The plaintiff's arguments to the contrary are not persuasive.  First, citing *Galloway v. County of Nassau*, No. 19-CV-5026, 2024 WL 1345634, at *9 (E.D.N.Y. Mar. 29, 2024), the plaintiff argues that "it is not necessary to decide at this stage of the . . . litigation whether the recordings are inadmissible insofar as neither M.M. nor J.S. are deceased or apparently missing." (ECF No. 71 at 15.)  *Galloway* is different.  There, the parties agreed that the witness, who was in custody, was probably available to testify because both sides knew where he was.  2024 WL 1345634, at *9.  The Court held that "[a]s long as the plaintiff can show that admissible evidence would be available at trial," summary judgment would be "inappropriate at this stage in the litigation.'"  2024 WL 1345634, at *9 (internal quotations omitted) (citing *Kee v. City of New York*, 12 F.4th 150, 170 (2d Cir. 2021)).  In this case, however, the plaintiff has not given the Court any reason to think that M.M. or J.S. will be available to testify at a civil trial in this matter — especially given their persistent efforts to avoid testifying to date:

- The plaintiff's charges were dismissed because M.M. refused to cooperate (Def. 56.1 ¶¶ 124–126).

- To date, neither M.M. nor J.S. has sat for a deposition as part of this litigation (*id.* ¶ 127).

- The defendants served three subpoenas and three notices by process server on either M.M. or a suitable adult at her address of record, and M.M. did not appear for her scheduled deposition or contact the parties (*id.* ¶¶ 127, 132–135).

- J.S. also never appeared for her deposition, or contacted the parties, although the defendants tried to serve her with a notice of subpoena at the address that the plaintiff's counsel gave them (*id.* ¶ 147).

- The plaintiff's lawyer could not produce either M.M. or J.S. for depositions (*id.* ¶ 154).

In light of this history of unavailability, there is no realistic "possibility" that M.M. and J.S. will testify.  (ECF No. 71 at 15.)  The plaintiff claims that the defendants did "not exhaust

their efforts to obtain [J.S.'s or M.M.'s] testimony [by] never mov[ing] to compel their appearances via a motion of contempt." (*Id.*) As explained above, the plaintiff has the burden of proof. He has not shown that moving for contempt would have secured either witness's appearance. The plaintiff has not met his burden to show that M.M. or J.S. would be available to testify at a trial. Fed. R. Civ. P. 56(c)(2); Advisory Cmte. Note to 2010 Amendment to Fed. R. Civ. P. 56(c); *see Rodriguez*, 788 F.3d at 46.

Nor is the recording of M.M. admissible under Federal Rule of Evidence 806. Rule 806 provides that "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes if declarant had testified as a witness.'" *Delvi v. United States*, 275 F. Supp. 2d 412, 417–18 (S.D.N.Y. June 17, 2003) (quoting Fed. R. Evid. 806). The plaintiff describes a scenario in which the defendants introduce M.M.'s photographic identification at a trial, which the plaintiff would then impeach with the recording. (ECF No. 71 at 16.) As the defendants point out, however, they are not offering M.M.'s statements to Commender, including her identification of the plaintiff, to prove that the plaintiff was the shooter. (ECF No. 61 at 19–20.) Rather, M.M.'s statements are being offered for their effect on the listener, Commender, and are relevant on the question of whether he had information establishing probable cause. (*Id.*) M.M's statements are not hearsay when offered for this purpose, and Rule 806 does not apply. *See Breeden v. City of New York*, No. 09-CV-4995, 2014 U.S. Dist. LEXIS 4165, at *15 (E.D.N.Y. Jan. 13, 2014) ("As to any statements of witnesses . . . such statements are not inadmissible hearsay where they are not offered for the truth of the matter asserted but for purposes of establishing whether the arresting officers had information giving them probable cause."); *Williams v. City of New York*, No. 10-CV-2676, 2012 WL 511533, at *3 n.2 (E.D.N.Y. Feb. 15, 2012) ("the witness statements

recorded in the police reports are not inadmissible hearsay because they are not offered for the truth of the matter asserted, i.e., that Williams was the shooter, but for purposes of establishing whether the police had information establishing probable cause").[19]

Accordingly, the private investigator's recordings of M.M. and J.S. are inadmissible and the Court will not rely on them in determining whether summary judgment is appropriate.[20]

## II.   False Arrest Claims

The standard for the plaintiff's federal false arrest claim is the same for his state law false arrest claim. *Fox v. City of New York*, No. 18-CV-9661, 2019 U.S. Dist. LEXIS 114650, at *9–10 (S.D.N.Y. July 10, 2019). "Probable cause for an arrest 'is a complete defense to any action for false arrest or malicious prosecution in New York.'" *Carwell v. City of New York*, No. 21-CV-480, 2023 U.S. Dist. LEXIS 13822, at *5 (S.D.N.Y. Jan. 26, 2023) (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010)).  For probable cause to exist, an officer must have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (cleaned up).  "The amount of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction, but it must constitute more than rumor, suspicion, or even a strong reason

---

[19] The plaintiff's arguments about J.S.'s recorded statements are equally unpersuasive.  He argues that J.S.'s statements to Commender about what she saw did not "factor into the probable cause to arrest" because Commender spoke with her after the plaintiff's arrest; thus, he argues, the defendants would offer the statements for their truth.  (ECF No. 71 at 15–16.)  In fact, however, the information that J.S. gave supported continuing probable cause through the initial stages of the plaintiff's prosecution, and are therefore also offered for a non-hearsay purpose. *See Breeden*, 2014 U.S. Dist. LEXIS 4165, at *15.  Accordingly, the private investigator's recordings are also not admissible under Rule 806.

[20] Because the Court finds that the private investigator's recordings are not admissible, the Court does not address the defendants' arguments in the alternative that the recordings would be unfairly prejudicial to the defendants, or that M.M.'s recording is inadmissible as irrelevant because she may be describing a different incident.  (*See* ECF No. 61 at 20–22.)

to suspect." *Bullard v. City of New York*, 240 F. Supp. 2d 292, 297 (S.D.N.Y. 2003) (cleaned up).

The question before the Court is whether M.M.'s statements about the shooting, including her identification of the plaintiff, constituted "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested," *Singer*, 63 F.3d at 119 — in other words, whether the information she gave Commender, together with the other information he had about the shooting, gave him probable cause to believe that the plaintiff was the shooter in the April 9, 2020 incident. The Court finds that the following information established probable cause.

First, M.M.'s account was corroborated by other evidence. M.M. said she got into Asare's car on the passenger side and saw the plaintiff shoot at the car. (Def. 56.1 ¶¶ 69–72; ECF No. 67-15 at 7.) At that point, Asare got out of the car and ran away, while she got into the driver's seat and sped away, looking for him. (Def. 56.1 ¶¶ 69–72.) This information was corroborated by Linda Gordon's statements to the 911 operator that she saw "a young black male running" after she heard the gunshots. (Def. 56.1 ¶ 11, *see* ECF No. 59-13 (Asare Instagram Video).) A second witness, Rosalyn Vigo, told Commender that she saw at least one person running after she heard gunshots. (Def. 56.1 ¶ 22.) The Markham Home surveillance footage also shows a person running across the frame just after the shots were fired. (*Id.* ¶ 7.)

There is also corroboration for M.M.'s statement that she got in the driver seat and sped away. Octavio Mercado told Commender that he heard cars speeding down North Burgher after the shots. (*Id.* ¶¶ 26–27.) The surveillance footage also shows a car speeding up shortly after the shots. (*Id.* ¶ 27.)

M.M. told Commender in a text message that she saw the plaintiff fire the gun at Asare's car, a statement she repeated when he spoke to her in the car on April 21, 2020.  (Def. 56.1 ¶¶ 68–70.)  And she identified the plaintiff in a double-blind photo array.  (Def. 56.1 ¶¶ 73, 81.)[21]  Moreover, M.M. knew the plaintiff, which further supports her identification of him as the shooter.  *See United States v. Herbin*, No. 204-CR-93, 2005 WL 2789047, at *1 (D. Vt. Oct. 26, 2005) ("Clearly, the more contact a witness has had with the defendant, the greater the likelihood that an . . . identification is independently reliable."); *see also Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 336 (W.D.N.Y. 2011) (on habeas review, finding that witnesses who "recognized the" petitioner "as someone whom [they] already knew" "for a long time" rendered their identifications independently reliable).[22]

The plaintiff argues, nevertheless, that this information is insufficient to support probable cause.  First, he points out that Asare could not identify the shooter.  (ECF No. 71 at 17–18.) However, the fact that Asare could not identify the shooter does not mean that it was unreasonable for Commender to credit M.M.'s identification of the plaintiff.  *See Callahan v. City of New Haven*, No. 21-CV-1069, 2023 WL 1992620, at *5 (D. Conn. Feb. 14, 2023) ("The probable cause inquiry is an objective inquiry, and when the police are confronted with conflicting witness accounts about what happened, courts do not second-guess a police officer's decision to credit one witness's account over another in the absence of facts to show why no objectively reasonable officer could have resolved the conflicting accounts as the police did.").

---

[21] The plaintiff's argument that M.M. never spoke to Commender or identified the plaintiff in a photo array is based on, as discussed above, inadmissible evidence.

[22] The plaintiff argues that M.M.'s familiarity with the plaintiff and her concern for Asare made her identification less credible.  But Commender had no reason to suspect a that M.M. had a "bitter prior relationship" with the plaintiff, or any other reason that would give her a motive to lie.  *Sankar v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012).

The plaintiff also maintains that M.M. was not believable because she "repeatedly raised concerns in the text thread about Asare, who was on parole, being arrested." (ECF No. 71 at 21–22.)  According to the plaintiff, this "raises an inference that M.M. was an interested witness who may have been cooperating with Commender in an effort to protect Asare, and may have been induced to identify plaintiff." (*Id.*)  This is entirely speculative.  While M.M. was concerned for Asare, presumably because he was on parole, that is not a reason to question her credibility.  Asare was not a suspect in the shooting.  While M.M. expressed concern about Asare's parole status, once Commender assured her that Asare would not be arrested for a parole violation, she told Commender that she witnessed the shooting and identified the plaintiff.

The plaintiff next cites M.M.'s text message to Commender that "she *heard* it was someone named Rahshawn, . . . known as Ray Ray, who lived on Skinner Lane." (ECF No. 71 at 22.)  When Commender responded that that he suspected "Ray Ray," M.M. said that she saw the shooter "*coming across the street* from 65 North Burgher as she was exiting 65 North Burgher." (*Id.*)  The fact that M.M. was initially hesitant to say that she saw the plaintiff fire at Asare's car does not mean that Commender did not ultimately have probable cause to arrest the plaintiff.  Of course, the change in her account could have made Commender question whether she was telling the truth.  It would have been equally, if not more, reasonable for him to credit her ultimate identification of the plaintiff and that she told the truth once he assured her that he was not going to arrest Asare.  Accordingly, Commender had probable cause to arrest the plaintiff, and Commender is thus entitled to qualified immunity.  *Marcavage v. City of New York*, 689 F.3d 98, 110 n.7 (2d Cir. 2012).[23]

---

[23] In addition, even if the change in M.M.'s account undermined probable cause — and it did not — Commender is nonetheless entitled to qualified immunity for having "arguable probable cause" to arrest the plaintiff.  To support a qualified immunity defense, "the defending officer need only show 'arguable' probable cause." *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).  "Arguable

## III.    Malicious Prosecution Claims

"The elements of malicious prosecution under § 1983 are 'substantially the same' as the

elements under New York law, and 'the analysis of the state and the federal claims is identical.'"

*Coleman v. City of New York*, 688 F. App'x 56, 57 (2d Cir. 2017) (quoting *Boyd v. City of N.Y.*,

336 F.3d 72, 75 (2d Cir. 2003)).  "To establish a malicious prosecution claim under New York

law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against

plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."

*Coleman*, 688 F. App'x at 57 (citing *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d

Cir. 2010)).  "[C]ontinuing probable cause is a complete defense to a constitutional claim of

malicious prosecution."  *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).  "[F]or probable

cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of

some intervening fact."  *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (quoting *Lowth v.

Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)).

The plaintiff argues that probable cause should have dissipated when Commender

interviewed J.S., who also identified the plaintiff as the shooter.  (ECF No. 71 at 27–28; *see* Def.

56.1 ¶¶ 101–102.)  The plaintiff argues that J.S. "contradicted all other information received

from M.M."  (ECF No. 71 at 28.)  The plaintiff says that "J.S. supposedly told police that

plaintiff was hanging out inside of 65 North Burgher before the shooting," but "M.M.

purportedly told Commender plaintiff came from across the street."  (*Id.*)  However, this minor

---

probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable
cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause
test was met."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  Even accepting the plaintiff's
argument that Commender should have doubted M.M.'s credibility, this at most shows that "officers of
reasonable competence could disagree on whether the probable cause test was met."  *Id.*

discrepancy — whether the plaintiff came out of a building or was already outside when he started shooting — did not mean that there was no longer probable cause.  The critical point is that both witnesses independently advised Commender that they saw the plaintiff near 65 North Burgher before he fired at Asare's car.

Next, according to the plaintiff, it is significant that "M.M. never mentioned a second individual being involved or present during the shooting, [but] J.S. allegedly described [the] plaintiff planning the shooting from inside of 65 North Burgher with a second individual, who was initially going to perpetrate the shooting, but instead allegedly handed the gun off to plaintiff."  (*Id.*)  The fact that M.M. did not know about or see a second person is irrelevant; J.S. never said that the second person was outside the building, or that M.M. could have seen him.

Finally, the plaintiff claims that the fact that J.S. was in custody on an unrelated case gave her "a potential motive for her to provide false information."  (*Id.* at 27.)  Her custodial status, without more, does not provide a motive for her to lie about the plaintiff's involvement.

Accordingly, probable cause is a complete defense to the plaintiff's state and federal false arrest and malicious prosecution claims, and the defendants are granted summary judgment as to these claims.

## IV.   Fair Trial Claims

A plaintiff bringing a § 1983 fair trial claim based on fabrication of evidence must establish that "(1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions."  *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021) (citing *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279–80 (2d Cir. 2016)).  The Second Circuit equates "the fraudulent omission of factual information with the affirmative perpetration of a falsehood,

and expressly disclaims any plausible legal distinction between misstatements and omissions." *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *17 (S.D.N.Y. Sept. 29, 2018) (cleaned up).

      **a.**    **Commender**

The plaintiff argues that "the record supports several theories which could support a denial of right to fair trial claim." (ECF No. 71 at 30.) For example, the plaintiff maintains that Commender withheld "exculpatory or impeaching" evidence from prosecutors because he "withheld a text thread from the RCDAO . . . including M.M.'s initial statement that she had only heard who the shooter was, which contradicted her subsequent statement that she saw the shooter and that he was coming from across the street." (*Id.* (citing *Hamilton v. City of New York*, No. 15-CV-4574, 2019 WL 1452013, at *22 (E.D.N.Y. Mar. 19, 2019)).) As discussed above, the fact that M. M. first told Commender that she heard someone was the shooter did not defeat probable cause because she subsequently explained that she saw the shooting, that the plaintiff was the gunman, and her account was corroborated by other evidence. For the same reasons, her initial text message was not "likely to influence a jury's decision." *Kee*, 12 F.4th at 168 (citing *Garnett*, 838 F.3d at 279–80).

*Hamilton v. City of New York*, on which the plaintiff relies, is distinguishable. In that case, the only witness recanted her identification of Hamilton in affidavits and at post-conviction proceedings, and said that the police had coerced her to identify him. *See Hamilton*, 2019 WL 1452013, at *6. The court found that the plaintiff's fair trial claim survived summary judgment because "although [that witness's] initial exculpatory statement was recorded in [one officer's] notebook, it was not mentioned in [that officer's] subsequent official interview report," and it was otherwise supported by "the affidavits and testimony of additional third-party witnesses."

*Id.* at *18.  Here, while M.M. ultimately refused to respond to Commender or to the prosecutor, she never recanted her identification of the plaintiff or any other part of her account to Commender.[24]  Nor did she claim that Commender coerced her.

Next, the plaintiff claims that "Commender likewise withheld from the RCDAO that he believed M.M. was no longer cooperative."  (ECF No. 71 at 30.)  There is a factual dispute about whether Commender informed the prosecutor about his text messages with M.M. when the plaintiff was arrested or communicated to the DA's office his "impression" that M.M. "was not seeming like she wanted to cooperate" in those text messages.  (Def. 56.1 ¶¶ 96–97; *cf.* Pl. 56.1 ¶ 97 (response).)  Commender said in his deposition that he told the DA's office that day about his impression; ADA Signorile said in his deposition that he did not learn there was any witness cooperation issue until August 2020.  (*Id.*)

However, drawing all inferences in the plaintiff's favor, there is no basis to conclude that "the plaintiff suffered a deprivation of life, liberty, or property" because Commender did not tell ADA Signorile about his text messages with M.M. or about his "impression" that she "was not seeming like she wanted to cooperate."  (Def. 56.1 ¶¶ 96–97.)  *Kee*, 12 F.4th at 168 (citing *Garnett*, 838 F.3d at 279–80).  In her text messages to Commender on April 28, 2020, M.M. said that she was upset that detectives had shown up without masks on and had "banged on [her] door extremely loud[ly]."  (ECF No. 67-15 at 15–18.)  After Commender assured her that the detectives had "looked at the wrong case" and that "[i]t was a mistake" for them to have come to her home, M.M. said "[t]hank you" and did not continue the conversation.  (*Id.*)  There is no reason to conclude that these text messages or Commender's "impression" would have convinced the prosecutor at the early stage of the prosecution that M.M. would never cooperate,

---

[24] As discussed above, the plaintiff's argument that M.M. never identified the plaintiff is based on inadmissible evidence.

and that the plaintiff would have been released.  The prosecutor ultimately decided that he did

not have enough evidence to take the case to trial, but that was after M.M. stopped responding to

Commender, and either blocked him or changed her number, and after ADA Signorile and

several "Detective Investigators from the Richmond County District Attorney's Office" tried

unsuccessfully to contact M.M.  (*Id.* ¶¶ 121–124.)[25]

### b.    Dinkle and Burke

The plaintiff also seeks to amend the complaint to assert fair trial claims against

Detectives Dinkle and Burke.[26]  Commender arranged for Dinkle to conduct a double-blind

photo array for M.M.  (Def. 56.1 ¶¶ 62, 63.)  Burke rode in the car with Dinkle to the location the

photo array was conducted.  (*Id.* ¶ 81.)  Neither detective had any knowledge about the case for

which the photo array was being administered, and had no other involvement in the

investigation.  (*Id.* ¶¶ 76–79.)  Burke was not "personally involved" in administering the photo

array, other than physically being at the location, standing outside the vehicle while Dinkle

administered the photo array.  (*Id.* ¶ 81.)  These facts do not amount to a constitutional violation

of any kind by Burke or Dinkle.  Amendment would therefore be futile.

The plaintiff argues that "based on the recorded statements of M.M. and J.S., there is

some evidence in the record that Commender, with the assistance of Dinkle and Burke,

---

[25] The plaintiff also argues that "evidence in the record [] supports that Commender may have fabricated the discovery of shell casings" on the night of the shooting.  (ECF No. 71 at 9, 30.)  The plaintiff relies on evidence that another officer did not see the shell casing.  (*Id.*)  This argument is speculative, but in any event immaterial because Officer Intranuovo, who is not a defendant in this action, found a nine-millimeter shell casing on the porch of 61 North Burgher and another nine-millimeter casing underneath that porch.  (Def. 56.1 ¶ 28.)

[26] For the reasons stated above, the false arrest and malicious prosecution claims the plaintiff seeks to bring against Dinkle and Burke are futile because of the existence of probable cause.  Accordingly, the plaintiff is also denied leave to amend to add false arrest and malicious prosecution claims against Dinkle and Burke.

fabricated the photo array." (ECF No. 71 at 31.)  However, as discussed more fully above, these statements are inadmissible hearsay and the Court does not consider them.

Accordingly, the plaintiff's motion to amend to add Dinkle and Burke as defendants is denied as futile.

## V.    Failure to Intervene Claim

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (cleaned up).  There were no constitutional violations that would have required intervention in this case.  *See Simon v. City of New York*, No. 18-CV-3400, 2019 WL 2579124, at *6 (E.D.N.Y. June 24, 2019) ("Because plaintiffs have not shown that any of their constitutional rights were violated, the failure to intervene claim is dismissed.").[27]  Accordingly, the plaintiff's failure to intervene claim fails as a matter of law.

## VI.    John and Jane Does

The plaintiff also brings claims against "John and Jane Doe 1 through 10." (ECF No. 1.) The plaintiff never moved to amend his complaint to name these defendants or serve the complaint upon these defendants.  Accordingly, the plaintiff's claims against John and Jane Doe are dismissed in their entirety without prejudice.  *See* Fed. R. Civ. P. 4(m) (mandating dismissal

---

[27] Moreover, the Court denies the plaintiff leave to amend to add Dinkle and Burke as defendants.  Thus, Commender is the only individually named defendant in this action.  A "defendant[] cannot be liable for both [an] underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation." *Buari v. City of New York*, 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021).

without prejudice of claims against a defendant that is not served within 120 days after the complaint is filed); *see, e.g.*, *Dewitt v. Home Depot U.S.A., Inc*., No. 10-CV-3319, 2012 WL 4049805, at *1 (E.D.N.Y. Sept. 12, 2012) (dismissal of plaintiff's claims against fictitious defendants appropriate where the plaintiff failed to amend his complaint to name those defendants or serve the complaint upon those defendants).

## CONCLUSION

For these reasons, the defendants' motion for summary judgment is granted in full and the plaintiff's cross-motion to amend is denied. The claims against John and Jane Does 1 through 10 are dismissed without prejudice.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      September 18, 2024